STATE OF NEBRASKA, APPELLEE, V. ODELL FORD, APPELLANT.
501 N.W.2d 318

Filed March 16, 1993.   No. A-92-314.

Thomas M. Kenney, Douglas County Public Defender, and Kelly S. Breen for appellant.

Don Stenberg, Attorney General, and Donald A. Kohtz for appellee.

SIEVERS, Chief Judge, and CONNOLLY and WRIGHT, Judges.

CONNOLLY, Judge.

## I. INTRODUCTION

This appeal arises from the conviction of the appellant, a hotel porter, on two counts of theft by unlawful taking. The

appellant challenges the admission into evidence of computer-generated records which indicated that during the time periods when the thefts occurred, the appellant had gained entry to the hotel rooms from which the missing property had been taken. The appellant also argues that the trial court's jury instruction on reasonable doubt erroneously diminished the State's burden of proof. We affirm.

## II. FACTS

### 1. REPORTS OF STOLEN PROPERTY

The appellant, Odell Ford, began working as a porter at the Homewood Suites hotel complex the morning of June 6, 1991. His job was to empty trash collected by the hotel's maids and stock guestrooms with new linens. The evening of June 6, two Homewood guests reported that personal items were missing from their rooms. Curtis VanDeen in room 318 was missing a key chain with two men's rings attached, and Kristy Oehlert in room 233 was missing a pair of diamond earrings.

### 2. HOMEWOOD'S COMPUTER SYSTEM

The doors to Homewood's guestrooms can be opened with keys, but Homewood does not issue keys to its guests. Instead, Homewood utilizes the Cellular Lock System, a computerized lock system, to control access to its guestrooms. All the doors to guestrooms are equipped with security devices that are unlocked by cards rather than keys. At check-in, the guest's credit card is run through a machine, which sends a message to the system's lock computer. The lock computer then signals the device on the guest's door to allow access to the room whenever the guest's credit card is inserted into the device. If the guest does not want to use his or her own credit card to open the door, Homewood issues the guest a plastic card that functions in the same manner as the credit card. Homewood employees whose duties require entry into guestrooms also receive access cards.

The computer system records the opening of every guestroom door on the Homewood property, whether by card or key. The computer records the date and time of access, whether access was obtained by card or key, and, if by card, the name of the person to whom the card was issued. There is no

 

human input into the recordkeeping process, and no calculation of figures is involved.

### 3. RECORDS IMPLICATE FORD

The access cards for Homewood employees are identified by the employees' names. A card had not yet been prepared for Ford on his first day of work, so he was issued the card assigned to "Mary CC," who was not working that day. Ford was the only employee authorized to use the "Mary CC" card on June 6.

In response to the reports of stolen items by guests VanDeen and Oehlert, Glenda Willmon, Homewood's general manager, consulted the hotel's computerized records to determine who had entered rooms 318 and 233 throughout the course of the day.

VanDeen left room 318 the morning of June 6 between 8 and 8:30. Before leaving, he removed from his pocket a key chain with two men's rings attached and placed it on the kitchen table. He returned at 5:14 p.m. The "Mary CC" card had been used to gain entry to VanDeen's room at 10:35 a.m. and again at 3:51 and 3:54 p.m. The computer records also showed that a regular key had been used to open the door to VanDeen's room at 11:08 a.m. and 3:54 p.m.

Before taking an early afternoon nap in room 233, Oehlert had taken off her diamond earrings. Oehlert wore a different pair of earrings when she next left the room. She placed the diamond earrings on a glass shelf in the vanity area of the room. Oehlert left the room at approximately 3:30 p.m. and returned at 10:44 p.m. The "Mary CC" card had been used to gain entry to Oehlert's room at 5:15 p.m. That was the only entry into Oehlert's room during her afternoon and evening absence.

When questioned on June 7, 1991, by Willmon, Ford initially denied ever entering rooms 318 and 233. After Willmon explained the computerized recordkeeping system and produced printouts of the entries to rooms 318 and 233 on June 6, Ford admitted that he had used both the "Mary CC" card and a regular key to enter the two rooms, but denied taking the missing items. Ford was charged with two counts of theft by unlawful taking.

## 4. TRIAL

At trial, Willmon testified to the manner in which the computerized access and recordkeeping system functioned, and the State offered into evidence exhibits 10 and 14, the computer printouts detailing Ford's multiple entries into rooms 318 and 233 while the occupants were gone. Arguing hearsay and lack of foundation, defense counsel continually objected to Willmon's testimony and the offers of exhibits related to the computerized recordkeeping system. The objections were overruled. Willmon was allowed to testify about the computerized recordkeeping system, and the computer printouts were admitted into evidence.

The jury found Ford guilty of both counts of theft by unlawful taking. On count I, theft of Oehlert's diamond earrings, Ford was sentenced to a prison term of $6 \frac{2}{3}$ to 20 years. For theft of VanDeen's rings, count III of the amended information, Ford was sentenced to a prison term of 20 months to 5 years, to run concurrently with the sentence on count I.

## III. ASSIGNMENTS OF ERROR

Ford assigns as error the admission into evidence of Homewood's computer printouts and the overruling of his objection to the jury instruction on reasonable doubt.

## IV. STANDARD OF REVIEW

In proceedings where the rules of evidence apply, the admission of evidence is controlled by rule and not by judicial discretion, except where judicial discretion is a factor involved in assessing admissibility. *State v. Timmerman*, 240 Neb. 74, 480 N.W.2d 411 (1992).

Regarding a question of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court. *Nebraska Builders Prod. Co. v. Industrial Erectors*, 239 Neb. 744, 478 N.W.2d 257 (1992).

All the instructions must be read together, and if the instructions taken as a whole correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *State v. Williams*, 239 Neb. 985, 480 N.W.2d 390 (1992).

## V. ANALYSIS

### 1. ADMISSION OF COMPUTER PRINTOUTS

Ford's objections to the computer printouts were based on lack of foundation and on hearsay. Neb. Rev. Stat. § 27-803(5) (Reissue 1989) establishes a hearsay exception for business records. The three foundational requirements for admission of business records under the hearsay exception are: (1) The activity recorded must be a type which regularly occurs in the course of the business' day-to-day activity, (2) the record must have been made at or near the time of the event recorded, and (3) the record must be authenticated by a qualified witness. *State v. Wilson*, 225 Neb. 466, 406 N.W.2d 123 (1987).

In the case at bar, there is no question that the first two requirements of the business records exception were satisfied. First, the activity recorded was the unlocking and opening of the doors to rooms 318 and 233, an activity which regularly occurs and is regularly recorded in the course of Homewood's day-to-day business. Second, the records were made instantaneously; entry by card or key is recorded into the computer's memory at the moment the device on the door is unlocked.

Ford's argument focuses on the third requirement of the business records exception. He argues that Willmon was not qualified to testify about the computer system and authenticate the computer-generated records. In addition, Ford contends that "the State failed to lay a proper foundation as to whether the computer security system was standard within the industry and whether retrieval of information from the system occurs in an ordinary manner which indicates trustworthiness." Brief for appellant at 5.

### (a) Qualification of Witness

At trial, as the State began using Willmon's testimony to explain the computerized lock system and authenticate the printouts, defense counsel objected and asked for permission to voir dire Willmon for foundation. The court granted defense counsel's request. Defense counsel established that Willmon did not have a degree in computers, did not invent the computer used at Homewood, and was unfamiliar with the computer's

components. Willmon testified that the company that had installed the computer system at Homewood gave her 3 weeks of training in how to operate the computer system.

The facts before us are analogous to those in *State v. Estill*, 13 Kan. App. 2d 111, 764 P.2d 455 (1988), in which a records custodian testified about computer-generated "phone trap" records. In a phone-trap arrangement, a telephone company computer traces all calls made to a certain number and records and stores the numbers of the phones from which the calls originated. At trial, the records custodian explained the computerized phone trap and testified that the computerized records were made at the time a harassing call was reported and were kept in the ordinary course of business. However, she could not explain how the computer itself operated. The court noted that it previously had held that a police officer operating a radar unit did not have to be an expert in the science or theory underlying the instrument; the fact that the officer was trained to operate the device was sufficient foundation for admitting evidence produced by the radar unit. In *Estill*, the court held that admission of the computer-generated phone-trap evidence under the business records exception was proper.

In the case at bar, Willmon explained how the computer system worked and testified that the computer instantaneously recorded the opening of every guestroom door on the property. Her testimony indicated that she was proficient at retrieving and printing out information stored in the computer system. Willmon's situation is analogous to that of the records custodian in *Estill* or the officer, referred to in *Estill*, who uses a radar device. The record on appeal shows that Willmon was trained and competent in the use of the computer system. For purposes of foundation, it did not matter whether Willmon could discuss the components or engineering principles of the computer. Willmon was qualified to testify about the computer system and authenticate the system's printouts. The third requirement of the business records exception was satisfied.

### (b) Proof of Industry Standard

Ford cites *People v. Bovio*, 118 Ill. App. 3d 836, 455 N.E.2d 829 (1983), for the proposition that one of the foundational

requirements for admission of computerized business records is proof that the computer equipment is standard within the industry. *Bovio* cites Illinois case law and recites the foundational requirement of proof of industry standard, but offers no rationale for the requirement. One of the two cases cited in *Bovio* to support the requirement does not mention proof of industry standard as a foundational requirement for admission of computerized records. See *People v. Gauer*, 7 Ill. App. 3d 512, 288 N.E.2d 24 (1972) (the court must be satisfied from the foundation testimony that the sources of information, method, and time of preparation were such as to indicate [the computer's] trustworthiness). *Bovio* does not cite any Illinois statutory authority for requiring proof of industry standard to admit computer-generated records or business records in general. *Bovio* is not persuasive authority for adopting the foundational requirement at issue.

Although some jurisdictions have sided with *Bovio* and required proof that computer equipment is standard within the industry, we side with jurisdictions that have rejected such a requirement. See 2 McCormick on Evidence § 294 n.7 (John W. Strong 4th ed. 1992) (for citations to cases on both sides of the issue). "[T]estimony describing [computer] equipment should ordinarily be limited to the function that each unit performs in the process and that each is adequate for the purpose. Excursions into theory are not required or ordinarily appropriate." 2 McCormick on Evidence, *supra*, § 294 at 284. McCormick points out that with time, a type of technology becomes so commonplace and reputable that detailed foundational evidence is no longer necessary:

> [A]s new technologies develop and win acceptance, courts move in the direction of taking judicial notice of the validity of the underlying scientific principle. Radar is a case in point . . . . Similarly, the principles of electronic data processing are now a proper subject of judicial notice and should not require proof.

2 *id.* at n.9. Of course a specific computerized system must be shown to be reliable, but the imposition of the burden of proving industry standard is not justifiable. At this stage in the evolution of computer technology, there is no need to require

proof of industry standard. Concern over whether a computer system is reliable is addressed by § 27-803(5)'s requirement that the recordkeeping method be proven trustworthy.

We also are bound by the rule that admissibility of evidence is controlled by statute, not judicial discretion. See *State v. Timmerman*, 240 Neb. 74, 480 N.W.2d 411 (1992). In *McAllen State Bank v. Linbeck Const. Corp.*, 695 S.W.2d 10, 17 (Tex. App. 1985), the court made the following observation:

> "The [Texas] legislature did not see any necessity for additional requirements where the records sought to be introduced into evidence were electronically produced. Once the [foundational] requirements [set out in Texas' business records exception statute] are met the records are admissible and are to be given whatever weight they are entitled to."

Section 27-803(5) of the Nebraska rules of evidence does not require a party offering business records to prove that the recordkeeping system is standard within the industry. It is not within the province of an appellate court to amend § 27-803(5) by incorporating into the statute such a foundational requirement for computerized records.

For the reasons discussed above, we reject Ford's assertion that the State was required to prove that Homewood's computer system was standard within the industry.

### (c) Trustworthiness of Recording System

Section 27-803(5) states that business records evidence may be excluded if "the source of information . . . indicate[s] lack of trustworthiness."

On cross-examination of Willmon, defense counsel asked about an occasion on which Homewood's computer system had generated faulty information. In December 1991, defense counsel himself had gone to Homewood for a demonstration of how the system functioned. The computer's time-recording mechanism was out of order because the hotel's computer maintenance worker happened to be backing up the system's records during the time of the demonstration. Defense counsel questioned Willmon about the inaccuracy of the information produced by the computer system during the December

demonstration:

> [Defense:] So what was printed out there as a date and time was in fact not what the actual date and time [were]; is that correct?
>
> [Willmon:] Right. The time was off. If you remember, [the computer maintenance worker] said that he could reset the time and show you again, as he was in the middle of backing up some records.
>
> [Defense:] So it's possible to run something on the machine and not have it reflect the accurate date and time; is that right?
>
> [Willmon:] If you're backing up some records, yes.

The assertion that the computerized recordkeeping system was not trustworthy on June 6, 1991, is without merit. The computer-recorded times of entry into rooms 318 and 233 on June 6 were corroborated by Ford, VanDeen, Oehlert, and other hotel personnel. For instance, VanDeen testified that he returned to room 318 sometime between 5 and 5:30 p.m. The computer system shows that VanDeen returned at 5:14 p.m. Oehlert testified that she returned to room 233 sometime after 10:30 p.m. The computer system shows that Oehlert returned at 10:44 p.m. The record on appeal indicates that the system was functioning properly on June 6. Defense counsel's emphasis on the inaccurate computer readings generated while the system was being backed up in December 1991 is irrelevant.

### (d) Conclusion

The State satisfied the foundational requirements for the business records exception, and the record on appeal indicates the computer's recordkeeping system was trustworthy. Therefore, the trial court properly admitted the printouts into evidence.

### 2. REASONABLE DOUBT INSTRUCTION

At trial, during the instruction conference, defense counsel objected to the court's proposed instruction on reasonable doubt. The objection was overruled, and the following instruction was given to the jury:

> "Reasonable doubt" is such a doubt as would cause a reasonable and prudent person, in one of the graver and

more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, to a moral certainty, of the guilt of the accused. At the same time, absolute or mathematical certainty is not required. You may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken. You may find an accused guilty upon the strong probabilities of the case, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable. A reasonable doubt is an actual and substantial doubt reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.

The same constitutional challenge to the same jury instruction was litigated in *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991). The appellant in *Morley* relied on *Cage v. Louisiana*, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990). The Nebraska Supreme Court distinguished the instruction in *Cage* from the instruction at issue in *Morley*. The *Morley* decision, which upheld the constitutionality of the same jury instruction at issue in the case before us, was filed September 20, 1991, nearly 7 months before the filing of the notice of appeal in this case, yet *Morley* is not cited or discussed in Ford's brief. Rather than waste time and space reiterating the Supreme Court's rationale, we direct Ford to *Morley*. The assignment of error concerning the jury instruction is without merit.

AFFIRMED.